## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

             **Plaintiff,**

v.

TEXTRON AVIATION, INC. f/k/a/
HAWKER BEECHCRAFT GLOBAL
CUSTOMER SUPPORT, LLC and
HAWKER BEECHCRAFT SERVICES,
INC.,

             **Defendant.**

**Case No. 16-2380-DDC-JPO**

## MEMORANDUM AND ORDER

Plaintiff brings this action to recover damages that its aircraft sustained during a hail storm. Plaintiff contends that defendant negligently caused that damage when it left the aircraft on a runway (instead of placing it inside a hangar) during the hail storm. Both parties have moved for summary judgment. Plaintiff's Motion for Summary Judgment (Doc. 105) asserts that its delivery of the aircraft to defendant for maintenance and repairs created a bailment relationship that imposed a duty on defendant to safeguard the aircraft. Plaintiff asserts that the summary judgment facts establish that defendant breached that duty and negligently caused the aircraft to sustain damages amounting to $501,000. Plaintiff thus asks the court to enter judgment as a matter of law in its favor for $501,000.

In contrast, defendant's Motion for Summary Judgment (Doc. 84) asserts that Kansas law imposed no duty to put the aircraft in a hanger while it was at defendant's facility for maintenance and repairs. And, even if a duty existed, defendant argues, plaintiff's negligence

claim fails as a matter of law because plaintiff offers no expert opinion to establish causation, as Kansas law requires.

For reasons explained below, the court agrees with defendant. So, it grants defendant's Motion for Summary Judgment. The court also denies plaintiff's Motion for Summary Judgment. The court explains how it reaches these conclusions, below.

## I.    Motions to Exclude and Strike

Before considering the parties' summary judgment motions, the court addresses two other motions that defendant has filed. First, defendant filed a Motion to Exclude the Expert Testimony of Brad Guyton. Doc. 86. Second, defendant filed a Motion to Strike. Doc. 109. The court first addresses the Motion Strike and then turns to the Motion to Exclude.

### A.  Motion to Strike

Defendant's Motion to Strike (Doc. 109) asks the court to strike certain material from plaintiff's Motion for Summary Judgment (Docs. 105 & 106) and plaintiff's Opposition to defendant's summary judgment motion (Doc. 97).

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Our court has refused to apply Rule 12(f) to strike responses and replies to motions because this Rule applies only to "pleadings," and a response or a reply to a motion "is not a 'pleading' that the [c]ourt may strike under Rule 12(f)." *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1251 (D. Kan. 2017) (citing Fed. R. Civ. P. 7(a) (listing documents considered pleadings)); *see also Williams v. Alpine Banks of Colo.*, No. Civ. A. 05CV02475WDMME, 2006 WL 905333, at *2 (D. Colo. Apr. 7, 2006) (denying a motion to strike because "[m]otions, briefs in support of

motions, responses to motions, replies to responses to motions, and other papers are not pleadings under the Federal Rules and cannot be stricken by the [c]ourt under Rule 12(f)").

Also, our court disfavors motions to strike. *Landrith v. Gariglietti*, No. 11-2465-KHV, 2012 WL 171339, at *1 (D. Kan. Jan. 19, 2012), *aff'd*, 505 F. App'x 701 (10th Cir. 2012); *Semsroth v. City of Wichita*, No. 06-2376-KHV-DJW, 2008 WL 45521, at *2 (D. Kan. Jan. 2, 2008); *Nwakpuda v. Falley's, Inc.*, 14 F. Supp. 2d 1213, 1215 (D. Kan. 1998). Courts usually deny motions to strike absent a showing of prejudice against the moving party. *Semsroth*, 2008 WL 45521, at *2. And, "any doubt [about] the utility of the material to be stricken should be resolved against the motion to strike." *Landrith*, 2012 WL 171339, at *1.

Here, defendant seeks an order striking certain material from plaintiff's Motion for Summary Judgment and its Opposition to defendant's summary judgment motion. These documents are not pleadings that the court may strike under Rule 12(f). Also, defendant asks the court to strike certain material because, it contends, the material is inadmissible on summary judgment. For example, defendant seeks to strike: (1) certain deposition testimony of Nathan Marcus (Jordache Enterprises, Inc.'s corporate representative) because he lacks knowledge to support the testimony; (2) the unsworn expert report of Brad Guyton because it is hearsay; and (3) certain statements of fact that violate Fed. R. Civ. P. 56 or D. Kan. Rule 56.1, because they either include multiple allegations in one statement or lack specific citations to the factual record.[1] But, instead of striking this proffered summary judgment evidence, the "better approach is for the court to consider each [piece of proffered evidence] and, to the extent it may assert a

---

[1]     Defendant repeats these arguments in its summary judgment papers. This tactic puzzles the court. Our court has discouraged parties from filing motions to strike—particularly superfluous ones—viewing them as a "disfavored" practice. *See, e.g.*, *Nwakpuda*, 14 F. Supp. 2d at 1215. The court, yet again, urges parties and counsel to abandon the practice. It merely creates more papers for lawyers to write and more motions for the court to decide. It's utterly inconsistent with Fed. R. Civ. P. 1 which is designed "to secure the just, speedy, and inexpensive determination of every action and proceeding."

fact which is not admissible evidence, simply exclude the requested fact from the court's ultimate findings." *Murray v. Edwards Cty. Sheriff's Dep't*, 453 F. Supp. 2d 1280, 1284 (D. Kan. 2006) (denying a motion to strike an affidavit on summary judgment); *see also Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (affirming district court's evidentiary ruling that denied a motion to strike an affidavit on summary judgment and instead "relied on the declarations to the extent that they contained relevant and admissible material, ignoring inadmissible and irrelevant statements"); *Nelson v. Allstate Ins. Co.*, No. 92-2309-JWL, 1993 WL 105120, at *6 (D. Kan. Mar. 8, 1993) (denying a motion to strike an affidavit and holding that "[i]f the affidavit contains material that is not admissible or relevant, the Court will ignore it."). The court follows that approach here and denies defendant's Motion to Strike.

### B. Defendant's Motion to Exclude Expert Testimony

Defendant's Motion to Exclude Expert Testimony (Doc. 86) asks the court to exclude Brad Guyton's opinions about: (1) the aircraft's diminution in value; and (2) defendant's duty to keep the aircraft in a hanger while it was at defendant's facility for maintenance. Defendant makes several arguments supporting its Motion to Exclude Mr. Guyton's expert testimony under Fed. R. Evid. 702. First, defendant asserts that the court must exclude Mr. Guyton's proffered expert testimony about alleged diminution because he is not qualified to value or appraise aircraft. Second, defendant argues that Mr. Guyton's opinions about alleged diminution are unreliable because he used a flawed methodology to form his opinions. Finally, defendant asserts that Mr. Guyton's opinions about defendant's duty to hangar the aircraft are neither relevant nor reliable because they conflict with his own testimony about his industry experience as well as the facts of this case.

To resolve the parties' pending summary judgment motions, the court only needs to address defendant's third argument—whether Mr. Guyton's opinions about defendant's duty to hangar the aircraft are admissible under Fed. R. Evid. 702. The court agrees with defendant. Mr. Guyton's opinion about defendant's purported duty of care is neither relevant nor reliable under the circumstances here. The court thus excludes Mr. Guyton's proffered expert testimony on this subject. But, to resolve the parties' cross motions for summary judgment, the court need not address the admissibility of Mr. Guyton's diminution in value opinions. So, the court grants defendant's Motion to Exclude in part and denies it in part. The court grants defendant's Motion to Exclude Mr. Guyton's opinions about defendant's duty to hangar the aircraft. The court denies the remainder of defendant's motion as moot.

### 1. Legal Standard

The court has a "gatekeeping obligation" to determine the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). When it performs this gatekeeping duty, the court has broad discretion to decide whether to admit expert testimony. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)). The admissibility of expert testimony is governed by Federal Rule of Evidence 702. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

>    (d) the expert has reliably applied the principles and methods to the facts
>    of the case.

Fed. R. Evid. 702.

The court must apply a two-part test to determine admissibility. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)) (further citations omitted).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal quotation omitted). To determine whether the expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors—though not exhaustive—that trial courts may consider when determining reliability of proffered expert testimony under Fed. R. Evid. 702. They are: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4)

general acceptance in the scientific community.  *Id.* at 593–94.  The Supreme Court has emphasized that these four factors are not a "definitive checklist or test," and that a court's gatekeeping inquiry into reliability "must be tied to the facts of a particular case," *Kumho Tire*, 526 U.S. at 150, and thus may involve other pertinent considerations.

But in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundation.  *Id.*  For such testimony to satisfy the reliability standard, it "must be 'based on actual knowledge, and not mere "subjective belief or unsupported speculation."'"  *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590)).  "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded."  *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible."  *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241).  "[R]ejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee notes.  While *Daubert* unquestionably assigns a gatekeeper role for to trial judges, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).

The court has discretion to determine how to perform its gatekeeping function under *Daubert*.  *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  "The

most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Id.* (citations omitted). In this case, the parties do not request a hearing. And after reviewing the exhibits filed with the motions carefully, the court finds that the record provides sufficient information to render a decision without a hearing.

### 2. Analysis

Applying the two-part test to determine the admissibility of Mr. Guyton's expert testimony, the court first considers whether Mr. Guyton is qualified to render the expert opinion. Plaintiff asserts that Mr. Guyton is qualified to testify about defendant's duty to hangar the aircraft based on his 30-plus years of experience in the aircraft industry. Mr. Guyton previously worked for defendant's predecessor company in several, different roles including Director of Maintenance. Mr. Guyton now owns and operates BAG Aviation, Inc., a company that provides consulting services to buyers and sellers of aircraft. BAG Aviation, Inc. provides support to its clients with the pre-buy inspection, working with a broker, aircraft sales, and other technical advisory services. Also, Mr. Guyton was involved in the underlying facts leading to this lawsuit. Plaintiff hired Mr. Guyton as a contractor to assist with technical day-to-day maintenance and repairs on its aircraft while the aircraft was at defendant's facility. Mr. Guyton worked as a portable Director of Maintenance, and he oversaw the maintenance and airworthiness of plaintiff's aircraft until plaintiff sold it.

The court agrees that Mr. Guyton's experience—including his 30 years of experience in the aircraft industry—qualifies him to provide expert testimony about the standard of care for safeguarding aircraft during maintenance. Indeed, an expert witness's testimony "can rely solely on experience." *See United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009). Thus, Mr. Guyton's proffered expert testimony satisfies the first step of the two-step test.

But it's the second of the two-part test that presents the problems.  This second step requires plaintiff to show that Mr. Guyton's opinions are relevant and reliable.  And as the Tenth Circuit has explained, an expert witness's testimony based solely on experience "'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)).  The Tenth Circuit has explained the reason for this requirement:  "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)).  "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Here, Mr. Guyton opined that it is "customary within the industry that if an aircraft is at a facility for maintenance that it's kept inside a hanger."  Doc. 85-1 at 36 (Guyton Dep. 140:21–141:1).  Mr. Guyton bases this opinion on his experience in the aircraft industry.  Yet, his testimony about that experience and the facts of this case contradict his proffered opinion.

Mr. Guyton testified, based on his knowledge and his understanding from working with defendant, that "it's not possible to keep aircraft hangared all the time."  Doc. 85-1 at 36 (Guyton Dep. 139:8–12).  Also, this statement is consistent with Mr. Guyton's testimony about his previous experience working for defendant's predecessor.  During that employment, Mr. Guyton helped make decisions about moving aircraft around the facility to ramp space and hangar space.  Mr. Guyton acknowledged that the facility, at times, had too many aircraft to keep them all inside the hanger.  When that happened, Mr. Guyton decided which aircraft to place in a hangar based on the aircraft's schedule and its release date.

Mr. Guyton recognizes that maintenance facilities use different procedures and charge customers different rates to pay for hangar space. But, in this case, Mr. Guyton never signed any authorization to pay for hangar space at defendant's facility when he was working as plaintiff's contractor and as its portable Director of Maintenance. Also, Mr. Guyton acknowledged that the parties' contract never required defendant to store the aircraft in a hangar. And Mr. Guyton does not recall plaintiff—his ultimate boss, in effect—ever asking him to have the aircraft placed in a hangar.

Throughout the time that plaintiff's aircraft was located at defendant's facility, Mr. Guyton never directed defendant to place the aircraft in a hangar. Mr. Guyton also does not know if defendant had hangar space available for the aircraft on June 5, 2014—the date when the hail storm occurred. Before the June 5 storm, Mr. Guyton knew that another storm had occurred at defendant's facility. And, during that earlier storm, the aircraft was parked outside. After he learned about the earlier storm, Mr. Guyton never asked defendant to put the aircraft in the hangar. Also, he neither provided any follow-up instructions nor gave any specific directions to defendant after he learned that the aircraft was outside (and not in a hangar) during the earlier storm.

Despite Mr. Guyton's testimony about industry standards and the facts involved in this case—things that directly conflict with his opinion—Mr. Guyton nevertheless opines that defendant had a duty to place plaintiff's aircraft in a hangar. But Mr. Guyton concedes that he can produce no literature supporting this opinion. And he knows of no published authority supporting his opinion. Also, Mr. Guyton testified that none of his training in the aircraft industry addressed the issue whether—and when—a maintenance facility should store an aircraft inside a hangar.

In sum, Mr. Guyton's deposition testimony demonstrates that his opinion is not "tied to the facts" of this particular case. *Kumho Tire*, 526 U.S. at 150. Mr. Guyton's opinion also conflicts with his own deposition testimony about the industry standard for placing an aircraft in a hangar at a maintenance facility. His opinion also contradicts the facts here—namely, that the parties' contract never imposed any duty on defendant to hangar the aircraft; Mr. Guyton never directed defendant to place the aircraft in a hanger (even after he knew that the aircraft was outside at defendant's facility during an earlier storm); and he never provided any follow-up instructions to defendant about how it should store the aircraft. Instead, the only connection between the facts here and Mr. Guyton's opinion is "'the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *Joiner*, 522 U.S. at 146).

Such an opinion will not help the trier of fact, making it inadmissible under Fed. R. Evid. 702. *See*, *e.g.*, *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (affirming district court's exclusion of expert testimony as unreliable because the expert "never explained why his personal experience was a sufficient basis for his opinion" and thus his "proposed testimony did not 'rest [ ] on a reliable foundation'" and "would not have "'assist[ed] the trier of fact' as required by Rule 702." (first quoting *Kumho Tire*, 526 U.S. at 141; then quoting Fed. R. Evid. 702)); *Davis v. BellSouth Telecomm., Inc.*, No. 7:10-cv-02851-LSC, 2012 WL 3637762, at *5 (N.D. Ala. Aug. 16, 2012) (excluding expert opinion that conflicted with the expert's deposition testimony about his experience and industry knowledge), *aff'd*, 541 F. App'x 910 (11th Cir. 2013).

All these considerations convince the court that it should exclude Mr. Guyton's opinion about defendant's purported duty to place the aircraft in a hangar. By this Order, it does so.

II.    **Motions for Summary Judgment**

The court now turns to consider the parties' Motions for Summary Judgment.

   A.  **Uncontroverted Facts**

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 99), or

uncontroverted for purposes of the parties' summary judgment motions.

*Plaintiff's Aircraft*

Plaintiff acquired a Hawker 4000 aircraft RC-8, S/N N803SA through a voluntary

surrender in lieu of foreclosure.  James Mason, plaintiff's Chief Asset Officer of Commercial

Asset Finance, eventually took over management of the aircraft.  Mr. Mason's management

included oversight of the aircraft's maintenance, its repairs, and, eventually, its sale.

In May 2011, plaintiff contracted and paid for hangar space for the aircraft with

FlightWorks in Manassas, Virginia.  Under the Aviation Services Agreement plaintiff entered

with FlightWorks, plaintiff paid $3,600 a month for hangar space.  Plaintiff paid no rental charge

when the aircraft was not at the storage location.

*Plaintiff Delivers the Aircraft to Defendant*

In late 2013, plaintiff delivered the aircraft to defendant at its Wichita, Kansas facility for

maintenance and repairs.  Plaintiff hired Brad Guyton as a contractor to assist with the aircraft's

technical, day-to-day maintenance and repairs while at defendant's facility.  Mr. Guyton worked

as a portable Director of Maintenance, and he oversaw the maintenance and airworthiness of the

aircraft for plaintiff until plaintiff sold it.  Mr. Guyton traveled to Wichita regularly to check on

the aircraft.  Mr. Guyton never asked defendant to hangar the aircraft.  Also, he never signed any

authorization to pay for hangar space at defendant's facility.  Mr. Guyton also knows from his

experience in the aviation industry that it's not possible to keep an aircraft hangared all of the time.

Between late 2013 through 2015, defendant performed all maintenance and repairs on the aircraft. This work included the maintenance required to keep the aircraft in airworthy condition while it remained at defendant's facility. Defendant performed ongoing engine runs on the aircraft every 15 days to keep the engine program up to date. Defendant also performed pre-maintenance and post-maintenance inspections. Plaintiff paid defendant $275,000 for maintenance and repair services it performed on the aircraft.

### Plaintiff Enters Into a Contract to Sell the Aircraft

Defendant knew that plaintiff was trying to sell the aircraft. And, on May 27, 2014, plaintiff entered into an agreement to do so. The agreement provided for plaintiff to sell the aircraft for $4.85 million, with an allowed reduction of $100,000 for non-airworthy "squawks" (*i.e.*, defects requiring maintenance). The potential buyer of the aircraft was an entity owned by Jordache Enterprises, Inc. ("Jordache"). Talon Air ("Talon") served as Jordache's agent in the contracted sale.

Mr. Guyton was directly involved in the aircraft's sale to potential buyers, including Jordache, through its agent Talon. Working for plaintiff, Mr. Guyon tried to get the deal completed with Jordache.

Matt Stern served as Jordache's Director of Aviation. He helped Jordache locate and purchase Hawker 4000 airplanes. Jordache was a knowledgeable purchaser of Hawker 4000 aircraft because it owned three or four of them while the company employed Mr. Stern. Mr. Stern testified that plaintiff's aircraft was an attractive purchase because Hawker 4000 airplanes were selling at economical prices after Hawker's bankruptcy.

### *The Hail Storm*

On June 3, 2014, defendant performed necessary work to return the aircraft to service because Talon wanted to flight test the aircraft during the week of June 2 to June 5, 2014.  For a flight test to occur, defendant must release the aircraft to service so that it is available to fly during the test.  Defendant never released the aircraft permanently, however, because plaintiff had an outstanding maintenance bill that it owed defendant.  So, defendant only released the aircraft for the flight test.  The flight test never occurred though because no crew was available to perform the test.

On June 5, 2014, a hail storm passed over defendant's facility.  During the storm, the aircraft was uncovered and located on a ramp outside defendant's facility.  While there, it sustained hail damage.

Defendant had adopted a policy and procedure titled Emergency Procedure Manual (the "Manual").  The Manual was in effect on June 5, 2014, and it applied to all of defendant's employees.  The Manual recognizes that severe weather is "one of the most common hazardous situations faced by all employees."  Doc. 106-11 at 17.  The Manual provides that the only protection from severe storms is to "maintain an awareness of existing conditions."  *Id.* at 18. Also, the Manual acknowledges that:  "Generally speaking, as severe weather approaches, the following alerts will go out from the National Weather Service."  *Id.*

The Manual provides multiple steps to take during severe weather, including:

1.      Service Department will monitor weather activity.

2.      Service Department will keep all department managers informed of trends that indicate the approach of severe weather.

3.      At the first indication of impending severe weather the Service Department will advise all department managers and the front office of the possibility of severe weather and the expected duration of such weather.

4.    Each department should take appropriate action to prepare for the incoming weather, *i.e.* store aircraft, (HBC and Based Customers have first priority) close hangar doors, secure ground support equipment and other loose items, etc.

5.    Service personnel will immediately check all aircraft on the line for proper tie-down and for internal/external gust locks as required on aircraft that can not be moved inside.

*Id.* at 18–19.

Despite the Manual's policies and procedures, defendant has not tasked a particular person to perform the actual weather monitoring function or receive National Weather Service alerts because it is not a primary concern. Instead, defendant delegated the responsibility for monitoring weather conditions to a company called Signature Flight Support.

In the early morning hours of June 5, 2014, the National Weather Service issued a Severe Thunderstorm Watch and Warning—both recognizing the possibility of hail—for Wichita, Kansas. Local news stations also reported the forecast for severe weather.

Defendant never notified plaintiff or Brad Guyton that severe weather was in the area on June 5, 2014. After the hail storm passed, Lee Nickell (defendant's customer service manager) sent an email to Brad Guyton asking when plaintiff was going to flight test the aircraft. Mr. Guyton responded that the flight would occur on Monday, if Talon didn't change its plans again. This communication was the first time that defendant learned that the flight test would not occur the week of June 2 to June 5. Later in the day, Mr. Nickell called Mr. Guyton to inform him that a hail storm had damaged the aircraft.

### The LUMP Contract

In 2013, plaintiff and defendant entered into a Low Utilization Maintenance Program ("LUMP") contract. The LUMP contract contains no provision requiring defendant to store the

aircraft in a hangar while located at defendant's facility.  Doc. 85-2 (LUMP contract).  Also, no written agreement existed between Mr. Guyton—personally—and defendant to provide hangar storage for the aircraft.  And Mr. Guyton had made no agreement with plaintiff to provide hangar storage for the aircraft.  Mr. Guyton does not recall plaintiff ever asking him to have the aircraft stored in a hangar while it was in defendant's possession.

### No Requests Made to Hangar the Aircraft

Before the June 5, 2014 hail storm, Mr. Guyton knew about an earlier storm that occurred at defendant's facility.  Mr. Guyton also knew that, during the earlier storm, plaintiff's aircraft was outside and not in a hangar.  Mr. Guyton never gave defendant any specific direction to hangar the aircraft after the earlier storm.  Also, he never gave defendant any follow-up instructions about where to place the aircraft, even though he knew that defendant had left the aircraft outside during a storm.

### Jordache Abandons the Contract

Before the hail storm, the aircraft was in airworthy condition.  After the aircraft sustained hail damage on June 5, 2014, it was no longer in airworthy condition.  Defendant provided plaintiff a cost estimate of $1.149 million to repair or replace the aircraft's hail-damaged parts.  Plaintiff paid $16,000 for the preliminary analysis needed to provide this cost estimate.

Also before the hail damaged the aircraft, Talon had identified a number of "squawks" that it wanted repaired before completing the purchase.  The parties never addressed these "squawks."

After the hail storm damaged the aircraft, Jordache initially "wanted" plaintiff to replace damaged flight controls.  Doc. 97 at 11; Doc. 107-6 at 7.  But, eventually, Jordache abandoned the contract that Talon had brokered with plaintiff to buy the aircraft.  On November 6, 2014,

Jordache through Talon issued a Notice of Termination, terminating the May 27, 2014 agreement to purchase the aircraft.  Jordache also explored purchasing the aircraft from plaintiff under a different agreement on an "as is" basis.  No such agreement ever came to fruition.

### Plaintiff Sells the Aircraft to Chad Williams

Plaintiff filed an insurance claim for the hail storm damage that the aircraft sustained.  Plaintiff eventually received $1.149 million in insurance proceeds.  But plaintiff did not use the proceeds to repair the aircraft.  Instead, plaintiff sold the aircraft without repairing the hail damage.

On November 13, 2014, plaintiff entered into a contract to sell the aircraft "as is" to Chad Williams for $3.525 million.  The parties to that agreement later closed the deal at a final price of $3.275 million.  Mr. Williams reduced the price without any explanation.  Plaintiff never asked and does not recall why Mr. Williams reduced the price below $3.525 million.  But plaintiff agreed to the reduction because the aircraft was difficult to market and plaintiff was incurring ongoing carrying and maintenance costs.

To arrive at the aircraft's sale price in the deal with Chad Williams, plaintiff considered several factors.  They included the contract price before the aircraft sustained damage, the cost of repairs, and the difference between the two amounts.  Plaintiff also took into account all of the market conditions based on other aircraft it had for sale at the time.  Plaintiff decided to sell the aircraft "as is" based on information it received from its broker and others.

Mr. Guyton testified that he "didn't see any indication" that Chad Williams "had any problem with continuing with the purchase of [the aircraft]" following the hail damage and receipt of the repair estimates.  Doc. 85-1 at 35 (Guyton Dep. at 134:14–135:9).  Also, Mr. Guyton testified that the aircraft had "a lot of history to go with it" besides the hail damage.  *Id.*

at 33 (Guyton Dep. 127:25–128:13). The aircraft had sustained damage on three other occasions when: (1) a contractor drilled a hole through the fuselage; (2) a hangar door closed on the right-hand elevator; and (3) a tool box came into contact with the fuselage, creating a groove in it. Mr. Guyton testified that Chad Williams (the eventual purchaser of the aircraft) compiled a list of repairs for the aircraft that included hail damage repairs as well as other non-hail-related repairs. Mr. Guyton recognized that Mr. Williams was taking the list of repairs and "using it to reduce the price he was willing to pay for" the aircraft. *Id.* at 33–34 (Guyton Dep. 129:24–130:3). Mr. Guyton also acknowledged Mr. Williams's reasons for compiling such a list: "[A]pparently he's trying to make sure that when he's done with these repairs and all these additions that he's not going to be in the hole." *Id.* at 34 (Guyton Dep. 128:24–129:5).

Plaintiff admits that a prospective buyer would consider whether parts of the aircraft would require replacement in the near future. Plaintiff also recognizes that the need to replace certain parts likely affects the value a prospective buyer would place on an aircraft and, in turn, affects the prospective buyer's offer. Potential purchasers of the aircraft sought a discount of the offered sale price. Potential purchasers also asked for credits for upgrades and replacements unrelated to hail damage. These requests involved work on the thrust reverser, upgrading the PDA,[2] and replacing the brakes. The PDA upgrades and replacing the brakes were expensive items. The aircraft also had other proposed repairs and replacements unrelated to hail damage, including replacing the brake packs, new tires, rebuild of the wheel assembly, and other problems with the aircraft's interior. The repairs ultimately made to the aircraft did not result from hail damage. And James Mason (plaintiff's Chief Asset Officer of Commercial Asset

---

[2]    The summary judgment record does not define this acronym.

Finance) concedes that these repairs could have affected the value of the aircraft "[a]s could any elective repair of this significant invoice."  Doc. 85-3 at 65 (James Mason Dep. 250:9–21).

Plaintiff does not know whether its decision to enter a contract with Chad Williams only 10 days after Jordache terminated its agreement to purchase the aircraft had an effect on the price plaintiff eventually secured for the aircraft.  Plaintiff also never determined whether selling the aircraft "as is" affected the aircraft's eventual sales price.  Plaintiff also never considered whether the length of time that the aircraft actively was listed on the market had caused diminution in the aircraft's value.

### B.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to

support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### C. Analysis

The court begins by considering plaintiff's Motion for Summary Judgment. Doc. 105. The court then addresses defendant's Motion for Summary Judgment. Doc. 85.

## 1. Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment in its favor on its negligent bailment claim.  Plaintiff asserts that Kansas law[3] imposed a duty on defendant, as bailee of plaintiff's aircraft, to safeguard the aircraft while it was in defendant's possession.  Plaintiff contends that the summary judgment facts establish that defendant breached this duty, as a matter of law, by leaving the aircraft outside and uncovered during the June 5, 2014 hail storm.  Thus, plaintiff asks the court to enter a judgment against defendant and award plaintiff damages in the amount of $501,000 (which, according to plaintiff, is the amount of the hail damage that the aircraft sustained).

In Kansas, a bailment involves the "'delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it.'"  *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 675 P.2d 864, 868 (Kan. 1984) (quoting 8 Am. Jur. 2d, *Bailments* § 2).  A "bailee" is the "person who receives the possession or custody of property under circumstances constituting a bailment . . . ."  *Id.* (quoting 8 Am. Jur. 2d, *Bailments* § 2).  A "bailor" is the "person from whom the property is thus received."  *Id.* (quoting 8 Am. Jur. 2d, *Bailments* § 2).

The bailee in a bailment made for mutual benefit has a duty to use "ordinary care and diligence in the safeguarding of the bailor's property, and he is answerable for loss or injury

---

[3]    The parties agree that Kansas law governs plaintiff's negligent bailment claim here.  Doc. 99 at 2 (Pretrial Order § 1.d.).  In diversity cases, like this one, the court applies the substantive law of the forum state, including its choice of law rules.  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014).  Kansas follows the approach of the First Restatement of Conflicts of Law in negligence cases, applying the rule of *lex loci delicti* and the substantive law of the state where the wrong occurs (*i.e.*, the place of injury).  *Dragon v. Vanguard Indus., Inc.*, 89 P.3d 908, 914 (Kan. 2004).  Here, plaintiff's alleged injury occurred in Kansas when the hail storm damaged the aircraft while situated at defendant's facility in Wichita.  The court thus applies Kansas law to this negligence claim.

resulting from failure to exercise such care, or . . . for any loss or injury due to his negligence, or ordinary negligence . . . .'" *Id.* (quoting 8 Am. Jur. 2d, *Bailments* § 221); *see also Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 363 (10th Cir. 1993) ("As bailees of an aircraft, defendants owed plaintiffs a duty of ordinary care and, therefore, are subject to liability for any damage occasioned by their negligence.").

But "[t]he mere fact that a bailee is in possession of personal property belonging to the bailor does not transfer responsibility for its safety to the bailee." *Global Tank Trailers Sales v. Textilana-Nease, Inc.*, 496 P.2d 1292, 1295 (Kan. 1972) (citation omitted). "A bailee is not an insurer of the safety of the property of the bailor, regardless of the nature of the bailment." *Id.*; *see also Va. Sur. Co. v. Schlegel*, 434 P.2d 772, 778 (Kan. 1967) ("'A warehouseman is not an insurer of goods received for storage, nor is he required to provide a building secure against all danger from outside risks.'" (quoting *Locke v. Wiley*, 105 P. 11, 13 (Kan. 1909))); *Strange v. Price Auto Serv. Co.*, 218 P.2d 208, 211 (Kan. 1950) ("[A] bailee is not the insurer of the bailed property. He owes the duty to exercise due care only."). Instead, Kansas law imposes a duty on a bailee to "'exercise due care and reasonable precaution to protect and preserve property placed in his custody; that is, such care as an ordinarily prudent person engaged in that business is in the habit of exercising toward property intrusted to him for safe-keeping.'" *Schlegel*, 434 P.2d at 779 (quoting *Wiley*, 105 P. at 13).

Here, defendant asserts, Kansas law imposed no duty requiring defendant to place the aircraft in a hangar while stationed at defendant's facility for maintenance. Thus, defendant reasons, plaintiff's negligent bailment claim fails as a matter of law. Plaintiff disagrees. Plaintiff asserts that Kansas law imposed a duty on defendant to safeguard its aircraft which included a duty to protect the aircraft from the hail storm.

In Kansas, negligence claims generally present questions of fact for a jury to decide, not legal questions for the court to rule. *Elstun v. Spangles, Inc.*, 217 P.3d 450, 453 (Kan. 2009) (citation omitted). But the question whether a duty of care exists is a legal determination the court must decide. *Id.* (citing *Nero v. Kan. State Univ.*, 861 P.2d 768, 770 Syl. ¶ 1 (Kan. 1993)); *see also Smith v. Kan. Gas Serv. Co.*, 169 P.3d 1052, 1057 (Kan. 2007) (explaining that "[w]hether a duty exists is a question of law" (citation and internal quotation marks omitted)). If the undisputed facts establish that a defendant had no duty to act in a certain way toward a plaintiff, the court may grant summary judgment against a plaintiff's negligence claim because, where no duty exists, defendant is not liable for negligence. *Elstun*, 217 P.3d at 453 (citing *Sepulveda v. Duckwall-Alco Stores, Inc.*, 708 P.2d 171, 173–74 (Kan. 1985)); *see also Conner v. Oller*, 805 P.2d 1260, 1991 Kan. App. LEXIS 62, at *6–7 (Kan. Ct. App. Feb. 1, 1991) (affirming summary judgment against a negligent bailment claim because the law imposed neither a duty on the bailee to insure the property against theft nor a duty to inform the bailor of an earlier burglary at its location where the property was stored).

The parties do not cite, and the court's research has not located, any Kansas case addressing whether an aircraft maintenance facility has a duty to protect an aircraft by placing it in a hangar. As noted, in Kansas, a bailee has a duty to exercise due care to safeguard the bailor's property, *i.e.*, "'such care as an ordinarily prudent person engaged in that business is in the habit of exercising toward property intrusted to him for safe-keeping.'" *Schlegel*, 434 P.2d at 779 (quoting *Wiley*, 105 P. at 13). Generally, expert testimony is required to establish the standard of care in cases involving professional endeavors. *See Schlaikjer v. Kaplan*, 293 P.3d 155, 162–63 (Kan. 2013) (concluding "expert testimony on the standard of care was necessary" because the appropriate standard of care for performing a medical treatment was "not within the

experience, education, or everyday knowledge of the average juror"); *see also Battenfield of Am.*

*Holding Co., Inc. v. Baird, Kurtz & Dobson*, 60 F. Supp. 2d 1189, 1211–12 (D. Kan. 1999)

(concluding that Kansas courts would require a party to offer "testimony from anyone with

experience or knowledge of the requisite standard of care for corporations performing due

diligence in the acquisition context" because the jury was "not in a position to determine how

much diligence is due without the assistance of someone who has that specialized knowledge—

an expert witness."); *Bowman v. Doherty*, 686 P.2d 112, 120 (Kan. 1984) ("Expert testimony is

required with respect to a question an ordinary person is not equipped by common knowledge

and skill to judge.").

Although plaintiff does not assert a professional negligence claim here, the court predicts

that the Kansas courts would require plaintiff to present expert testimony establishing the

appropriate standard of care for safeguarding an aircraft that is delivered to a facility for

maintenance.  Indeed, Kansas requires a bailor to establish that the bailee had a duty to exercise

such care as an ordinarily prudent person engaged in the aircraft maintenance business would

exercise toward an aircraft entrusted to it.  *Schlegel*, 434 P.2d at 779.  An average juror lacks the

kind of experience, education, or knowledge to answer this question.

Here, plaintiff offers no expert testimony to establish that Kansas law imposed a duty on

defendant to place the aircraft in a hangar.  The court recognizes that Mr. Guyton testified that, in

his opinion, it is "customary within the industry that if an aircraft is at a facility for maintenance

that it's kept inside a hanger."  Doc. 85-1 at 36 (Guyton Dep. 140:21–141:1).  But the court has

concluded that his opinion does not qualify as admissible expert testimony under Fed. R. Evid.

702 because it is not reliable and not relevant to the facts here.  *See supra* Part I.B.

And, even if expert testimony was not required to establish the requisite standard of care, Mr. Guyton's testimony—as a lay witness—demonstrates that no duty exists for a maintenance facility to place an aircraft in a hangar under either industry custom or the facts of this case. Indeed, Mr. Guyton testified, based on his experience in the aircraft industry, that it is not possible to keep an aircraft in a hangar at all times. He also recognized that maintenance facilities charge customers for storage services. In fact, in May 2011, plaintiff contracted with and paid FlightWorks to secure hangar space for the aircraft in Manassas, Virginia. In contrast, plaintiff's contract with defendant included no provision requiring defendant to store the aircraft in a hangar while it was at defendant's facility.

Also, Mr. Guyton does not recall plaintiff ever asking him to have the aircraft stored in a hangar. Mr. Guyton testified that he never asked defendant to hangar the aircraft. And he never signed any authorization agreeing to pay for hangar space at defendant's facility. Also, Mr. Guyton knew that defendant did not always keep its aircraft in a hangar. Mr. Guyton knew that the aircraft was stationed outside a hangar when a storm hit defendant's facility before the June 5, 2014 hail storm that damaged the aircraft. Even after this earlier storm, Mr. Guyton never directed plaintiff specifically to hangar the aircraft. Also, he never gave defendant any follow-up instructions about where to place the aircraft, even though he knew that defendant had left the aircraft outside during a storm.

Although no Kansas case directly addresses the question presented here, the court predicts that the Kansas Supreme Court would conclude on this summary judgment record that defendant had no duty to hangar plaintiff's aircraft. Instead, defendant owed plaintiff a duty of reasonable care—*i.e.*, such care as an ordinarily prudent person engaged in the aircraft maintenance industry exercises toward aircraft entrusted to it for maintenance. The

uncontroverted testimony, when viewed in defendant's favor,[4] neglects to establish that industry custom and practice imposed a duty on defendant—as a matter of Kansas law—to place the aircraft in a hangar during the June 5, 2014 hail storm.  Because the court concludes that defendant owed no duty to plaintiff to hangar the aircraft, plaintiff cannot establish at least one element of its negligent bailment claim.  The court thus denies plaintiff's Motion for Summary Judgment on its negligent bailment claim.

### 2.  Defendant's Motion for Summary Judgment

Defendant asserts several arguments supporting its motion to grant summary judgment against plaintiff's negligent bailment claim.  The court finds it necessary to address just two of those arguments.

*First*, defendant asserts that it is entitled to summary judgment because Kansas law imposed no duty on defendant to keep plaintiff's aircraft in a hangar while it was at defendant's facility for maintenance.  Doc. 85 at 18–20.  For reasons already explained in Part II.C.1., the uncontroverted facts, viewed in defendant's favor, fail to establish that Kansas imposed a duty on defendant to place the aircraft in a hangar before the June 5, 2014 hail storm.  Now, on defendant's summary judgment motion, the court views those uncontroverted facts in plaintiff's favor.  And those uncontroverted facts, construed in the light most favorable to plaintiff, establish that defendant owed no duty to place the aircraft in a hangar.

Mr. Guyton's testimony demonstrates that neither industry custom nor practice imposed such a duty.  To the contrary, Mr. Guyton recognizes, based on his experience in the aircraft industry, it is not possible to keep an aircraft in a hangar at all times.  Also, Mr. Guyton was

---

[4]     The court recognizes that, on plaintiff's summary judgment motion, the court must view the facts in defendant's favor.  But, even viewing the facts in plaintiff's favor—as the court considers in the next subsection when it addresses defendant's summary judgment motion—plaintiff cannot establish a triable issue to support this element of its negligence bailment claim.

aware that plaintiff's aircraft was not always placed in a hangar, as was true when a storm hit the facility before the June 5, 2014 hail storm. Still, Mr. Guyton never instructed defendant to move the aircraft inside a hangar. The parties' contract also imposed no duty on defendant to place the aircraft in a hangar. It never required defendant to place the aircraft in a hangar, and it never charged plaintiff any fees for storage. Under these facts, the court predicts that Kansas courts would conclude defendant had no duty to place the aircraft in a hangar. Plaintiff's negligent bailment claim thus fails as a matter of law, entitling defendant to summary judgment against this claim.

Plaintiff's Opposition to defendant's summary judgment motion tries to avoid summary judgment by arguing that defendant owed an expanded duty. Plaintiff argues that the duty imposed by Kansas law is "more general" and required defendant "to safeguard bailed items" in its possession. Doc. 97 at 32. Kansas law does not impose such a broadly-defined duty as the plaintiff seeks to impose. To the contrary, the Kansas Supreme Court has explained: "The mere fact that a bailee is in possession of personal property belonging to the bailor does not transfer responsibility for its safety to the bailee." *Global Tank Trailers Sales v. Textilana-Nease, Inc.*, 496 P.2d 1292, 1295 (Kan. 1972) (citation omitted). And a "bailee is not an insurer of the safety of the property of the bailor, regardless of the nature of the bailment." *Id.* Instead, Kansas law imposes a duty on a bailee to "exercise due care and reasonable precaution to protect and preserve property placed in his custody; that is, such care as an ordinarily prudent person engaged in that business is in the habit of exercising toward property intrusted to him for safe-keeping." *Va. Sur. Co. v. Schlegel*, 434 P.2d 772, 779 (Kan. 1967) (citation and internal quotation marks omitted). Applying that standard to the uncontroverted facts here, Kansas law did not obligate defendant to place plaintiff's aircraft in a hangar.

Plaintiff also argues that "[a]t the very least, [defendant] should have informed Plaintiff of its lack of hangar space to keep [the aircraft] safe *before* the damage occurred." Doc. 97 at 32. Plaintiff contends that defendant "could have at that time offered Plaintiff the option to pay for space, or, as an alternative, to take its business elsewhere entirely, rather than paying [defendant] some $275,000" for maintenance. *Id.* But plaintiff offers no authority demonstrating that defendant had a legal duty to take these steps.

Also, plaintiff contends, defendant's policies imposed a duty on it to monitor the weather. Defendant's Emergency Procedure Manual includes various procedures for severe weather, including monitoring weather activity. Doc. 106-11 at 18. The uncontroverted facts establish that defendant complied with this duty by delegating responsibility for monitoring weather conditions to a company called Signature Flight Support. But, for purposes of the summary judgment dispute here, the Manual imposes no duty on defendant to hangar each aircraft at its facility during severe weather. To the contrary, the Manual appears to recognize that not all aircraft will occupy hangar space during severe weather because the Manual directs that certain aircraft have storage priority. *Id.* ("Each department should take appropriate action to prepare for the incoming weather, *i.e.* store aircraft, (HBC and Based Customers have first priority) . . . .").

In sum, plaintiff's arguments against summary judgment are unpersuasive. The summary judgment facts, when viewed in plaintiff's favor, establish that Kansas law imposed no duty on defendant to place the aircraft in a hangar.

*Second*, defendant argues, even if it owed a duty to plaintiff, plaintiff's negligent bailment claim fails because plaintiff has adduced no admissible expert testimony establishing a causal link between defendant's alleged negligence and the damages plaintiff allegedly sustained

as a result of it. The court agrees. And it grants defendant's summary judgment motion for this second and independent reason.

In *Chapman v. Kansas Basement and Foundation Repair, Inc.*, 210 P.3d 137, 2009 WL 1911750 (Kan. Ct. App. July 2, 2009) (unpublished table opinion), the Kansas Court of Appeals affirmed a district court's judgment as a matter of law against a plaintiff's breach of contract and warranty claims because the plaintiff never offered expert testimony to establish that any breach of contract or warranty by defendant caused the value of plaintiff's home to diminish. *Id.* at *4. Like plaintiff's damage claim here,[5] the *Chapman* plaintiff's "sole approach to her damages was diminution in value." *Id.* But, the Kansas Court of Appeals held, the record showed "that there were structural issues that may have diminished the value of [plaintiff's] home separate and apart from any problems created by [defendant's] defective performance." *Id.* The court acknowledged that these "preexisting structural defects inherently impacted the district court's ability to determine whether, and to what extent, it should award [plaintiff] damages." *Id.* As the court explained: "'[W]hen a case involves preexisting conditions . . . that may complicate the question of damages, an expert is required to distinguish and attribute those damages that may have been caused by the preexisting condition . . . and those damages that may have been caused by defendant's breach of the standard of care.'" *Id.* (quoting *Schwartz v. Abay*, 43 P.3d 831, 834 (Kan. Ct. App. 2002)). Applying this rule to *Chapman*'s facts, the court concluded that "[t]he problems existent in [plaintiff's] home prior to [defendant's] contract made it virtually impossible for [plaintiff] to establish the extent to which [defendant] diminished the value of her home without expert testimony." *Id.* The court thus affirmed judgment as a matter of law

---

[5]     *See* Doc. 99 at 12–13 (Pretrial Order § 5) ("Plaintiff seeks to recover based on the reduction in the sales price of [the aircraft] before and after it sustained hail damage, and taking into consideration the insurance proceeds received and the amount received when [the aircraft] was sold in "as is" condition, plus prejudgment interest.").

against plaintiff's claim based on the "absence of evidence establishing the causal link between the alleged breach of contract and the alleged diminution of value." *Id.* at *5. *See also Lowrey v. Glassman*, 908 A.2d 30, 37 (D.C. Ct. App. 2006) (affirming summary judgment against a nuisance claim because "damages flowing from a nuisance are measured by the diminution of the property's value caused by the nuisance's interference with the enjoyment of the property," and plaintiff could not "prove his case without expert testimony" about "the causation of the alleged diminution in value" (citations and internal quotation marks omitted)).

Although *Chapman* decided a breach of contract case, its reasoning is equally persuasive in a negligence action like this case. Indeed, both causes of action include a causation element. The court thus predicts that the Kansas courts would apply *Chapman*'s reasoning to this case. Like *Chapman*, the undisputed summary judgment facts here establish that other preexisting defects "may have diminished the value of [plaintiff's aircraft] separate and apart from any problems created by [defendant's] defective performance." *Id.* at *4. These other preexisting defects include the pre-hail damage "squawks" that plaintiff never repaired and the "history" that came with the aircraft from three other incidents where the aircraft sustained damage. Because these preexisting defects "inherently impact[ ]" the "'ability to determine whether, and to what extent, it should award [plaintiff] damages," Kansas requires expert testimony "to distinguish and attribute those damages that may have been caused by the preexisting condition . . . and those damages that may have been caused by defendant's breach of the standard of care.'" *Id.* (quoting *Schwartz*, 43 P.3d at 834).

Here, plaintiff has marshaled no expert testimony to establish the requisite causal link to support its negligent bailment claim. Indeed, plaintiff's expert, Brad Guyton, testified that he does not have an opinion about the cause of the alleged diminution of the aircraft's value:

> Q.     But are you offering an opinion as to the cause of the diminution of value?
> A.     The cause, no.

Doc. 85-1 at 40 (Guyton Dep. 156:6–8).  Mr. Guyton also testified that plaintiff never asked him
to provide an opinion about the alleged cause of the aircraft's diminution in value:

> Q.     Were you asked to determine the cause of any diminution of value of [the
>        aircraft]?
> A.     No, I was not asked.

*Id.* (Guyton Dep. 155:20–22).

Without expert testimony to establish the requisite causal link, no reasonable jury can
conclude that defendant was negligent as a matter of law.  So, applying the reasoning of
*Chapman*, plaintiff's negligent bailment claim cannot survive summary judgment.

Plaintiff offers two arguments why *Chapman* doesn't apply here.  First, plaintiff says
*Chapman* only applies to real property.  But *Chapman* doesn't include such a limitation.  And
plaintiff offers no other authority showing that *Chapman* applies merely to real property.  To the
contrary, *Chapman* cited a medical malpractice case for the rule in Kansas that expert testimony
is required to "'distinguish and attribute those damages that may have been caused by the
preexisting condition . . . and those damages that may have been caused by defendant's breach of
the standard of care.'"  *Chapman*, 2009 WL 1911750, at *4 (quoting *Schwartz v. Abay*, 43 P.3d
831, 834 (Kan. Ct. App. 2002)).  *Schwartz* affirmed a district court's judgment notwithstanding
the verdict against plaintiff's claim for future medical expenses.  43 P.3d at 834–35.  The Kansas
Court of Appeals held that "there was no reasonable basis on which this jury could have
computed its award of future medical expenses" because plaintiff never offered expert testimony
"to show that future medical treatment would be the result of an improper surgery rather than the
result of his preexisting disc disease."  *Id.* at 834.  *Schwartz* thus applied the same rule invoked

in *Chapman* to personal injury damages.  The court thus rejects plaintiff's argument that *Chapman* only applies to real property damages.

Second, plaintiff argues that *Chapman* doesn't apply because a presumption of defendant's negligence arises in this bailment case.  *See M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 675 P.2d 864, 687 (Kan. 1984) ("When the bailor shows that the property was delivered to the bailee for hire and that the bailee has failed to return it, the bailor has made out a prima facie case of negligence against the bailee, and the burden of going forward with the evidence to explain the failure to redeliver then shifts to the bailee.").  *See also* Pattern Instructions for Kansas, PIK Civ. 4th 124.73 (2016) ("When bailed property is destroyed or damaged while in the exclusive possession and control of the bailee, the law presumes the bailee's negligence to be the cause of the loss and the bailee has the burden to prove that the loss was due to other causes consistent with due care on (his)(her) part.").

Even if that presumption applies here, plaintiff retains the burden to establish causation to prove a negligent bailment claim.  *Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 363 (10th Cir. 1993) (explaining that "the presumption . . . effects only a shift in the burden of production" but the "burden of persuasion" remains "always with plaintiffs"); *Strange v. Price Auto Serv. Co.*, 218 P.2d 208, 211, 215 (Kan. 1950) (holding in a bailment case that "the burden of proof of negligence is on plaintiff and never shifts" and explaining that defendant may rebut the presumption of negligence by "furnish[ing] evidence prima facie that the fire was not caused by its failure to exercise due care" and then the burden of production shifts to "the plaintiff to show that the fire was caused by the negligence of the defendant").  *See also Prettyman v. Hopkins Motor Co.*, 81 S.E.2d 78, 84 (W. Va. 1954) (explaining in bailment cases that: "[P]laintiff is not relieved [of] the burden of proving negligence upon the whole case merely because there may be

a presumption of negligence on the part of the defendant; but the bailor is not required to show that the loss of property was caused by the negligence of the bailee until after the bailee has introduced evidence to show that such loss was due to an excusable cause.") (citing 6 Am. Jur., *Bailments* § 368)).

Here, plaintiff claims defendant's negligence caused the aircraft's value to diminish. And plaintiff contends that the bailment presumption arises because the aircraft was in the possession of defendant (*i.e.*, the bailor) when it sustained hail damage. Applying a bailment presumption only shifts the burden of production to defendant, requiring defendant to rebut the presumption that its negligence caused the diminution in value. Defendant offers uncontroverted facts establishing several other reasons—besides the hail damage—why the aircraft's value diminished. These reasons include: the non-hail damage "squawks" that plaintiff never repaired; the "history" that came with the aircraft from three other incidents where the aircraft sustained damage; plaintiff's decision not to use the insurance proceeds to make repairs to the aircraft; plaintiff's offer to sell the aircraft "as is"; and plaintiff's decision to enter a contract with Chad Williams just 10 days after Jordache terminated its agreement to purchase the aircraft.

After coming forward with uncontroverted evidence to rebut the presumption of negligence, the burden of proof remains with plaintiff to establish negligence. And, as *Chapman* holds, plaintiff cannot establish that defendant caused the alleged diminution in value without expert testimony. *Chapman*, 2009 WL 1911750, at *4. *See also Lowry*, 908 A.2d at 37.

Plaintiff also asserts that, even if *Chapman* applies, it has offered sufficient evidence from which a jury could find the requite causal link. Plaintiff contends that Mr. Guyton's expert report shows that he provided an opinion about causation—despite his deposition testimony that he was not retained to offer such an opinion. The expert report does not present a genuine issue

of material fact for two reasons.  First, the expert report is hearsay evidence and inadmissible on summary judgment.  *See*, *e.g.*, *Ho v. Michelin N. Am.*, *Inc.*, No. 08-1282-JTM, 2011 WL 3241466, at \*13 (D. Kan. July 29, 2011) ("[T]his court has repeatedly emphasized that, when tested at summary judgment, the proponent of expert testimony may not simply present the unsworn report of the proposed expert" because it is inadmissible hearsay), *aff'd*, 520 F. App'x 658 (10th Cir. 2013); *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1371 (D. Kan. 1996) (holding that an expert report was not admissible evidence under Rule 56's requirement "that facts opposing summary judgment . . . be admissible in evidence").  Second, plaintiff cannot rely on the expert report to controvert Mr. Guyton's sworn deposition testimony that plaintiff never retained him to provide an opinion about causation.  *See Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013) (holding that plaintiff "cannot create a genuine dispute of material fact solely by relying on a conclusion that was written in an expert report and later qualified during that expert's deposition.  A witness's later qualifications are the relevant 'opinions' for purposes of summary judgment unless there is some reason for disregarding them.").

Plaintiff also asserts that it has adduced the requisite expert testimony through James Mason, plaintiff's Chief Asset Officer for Commercial Asset Finance.  But plaintiff never designated Mr. Mason as an expert witness.  Plaintiff concedes as much.  Doc. 97 at 28.  Mr. Mason's testimony thus is lay testimony which, as *Chapman* holds, cannot suffice to establish the requisite causal link between defendant's alleged negligence and the alleged diminution in value to plaintiff's property.  For all these reasons, the summary judgment facts fail to create a triable issue on the causation element of plaintiff's negligent bailment claim.  The court thus grants summary judgment against plaintiff's claim for another and independent reason.

In sum, the court grants defendant's summary judgment motion against plaintiff's negligent bailment claim for two independent reasons:  (1) Kansas law imposed no duty on defendant to place the aircraft in a hangar; and (2) plaintiff offers no expert testimony to establish a causal link between defendant's alleged negligence and plaintiff's alleged diminution in value damages.

## III.    Conclusion

For the reasons explained above, the court denies plaintiff's Motion for Summary Judgment and grants defendant's Motion for Summary Judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 84) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Summary Judgment (Doc. 105) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Exclude the Expert Testimony of Brad Guyton (Doc. 86) is granted in part and denied in part as moot.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Strike (Doc. 109) is denied.

**IT IS SO ORDERED.**

**Dated this 27th day of April, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**